UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VICTORIA ABARCA and )
MARIA SIERRA, on behalf of themselves )
and other similarly situated employees, )
)
Plaintiffs, )
)
v. ) Case No. 05 C 3873
)
MANHEIM SERVICES CORPORATION, ) Judge John W. Darrah
d/b/a GREATER CHICAGO AUTO )
AUCTION, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Victoria Abarca and Maria Sierra, filed a class-action suit against Defendants, Manheim Services Corporation d/b/a Greater Chicago Auto Auction ("Greater Chicago") and Cox Enterprises, Inc. ("Cox"), *inter alia*, in violation of the Fair Labor Standards Act ("FLSA") and the Illinois Minimum Wage Law ("IMWL") by failing to include so-called "flex credits" in Plaintiffs' regular rate of pay for overtime purposes. Cox was subsequently dismissed for lack of personal jurisdiction. Currently before the Court is Greater Chicago's Motion for Partial Summary Judgment on the "Flex Credit" Issue.

## FACTS

Abarca was employed as a non-exempt employee by Greater Chicago from September 7, 1999 through March 2, 2005. (Def.'s 56.1(a)(3) Statement ¶¶ 5-6). Sierra was employed as a non-exempt employee by Greater Chicago from August 8, 1994 through September 3, 2004. (Id., ¶¶ 5, 7). Plaintiffs' duties included various tasks related to the cleaning of vehicles before auction. (Id., ¶ 4). From July 1, 2002 through November 21, 2003, Plaintiffs were paid an

hourly rate, plus bonus and commission payments. (Id., ¶ 9). Beginning November 22, 2003, Plaintiffs were paid a fixed amount per vehicle cleaned. (Id., ¶ 10).

Greater Chicago is a wholesale automobile auction located in Matteson, Illinois. Greater Chicago auctions cars during weekly auctions. Greater Chicago does not own the vehicles that are auctioned but is responsible for them at the auction. The auctions are open only to automobile dealers. (Def.'s 56.1(a)(3) Statement ¶ 8).

Cox, Greater Chicago's indirect parent company, sponsors a cafeteria plan, the Flex Plan, under which certain of Cox's corporate affiliates, including Greater Chicago, offer their eligible employees "flex credits," which the employees can apply toward the purchase of certain health and welfare benefits. (Def.'s 56.1(a)(3) Statement ¶ 11). The Flex Plan is a cafeteria plan governed by Section 125 of the Internal Revenue Code. (Id., ¶ 12). A cafeteria plan is a separate, written plan maintained by the plan sponsor under which all participants are employees, and each participant has the opportunity to select the particular benefits that he or she desires among a range of offered benefits. (Id., ¶ 13). Information regarding the operation of and the benefits available under the Flex Plan is communicated to employees in the Summary Plan Description, which employees receive when they are hired ("the Flex Plan SPD"). The Flex Plan SPD provides that the purpose of the Flex Plan is to "provide[e] a variety of benefits – like healthcare, life insurance and disability coverage designed to promote [the employee's] health, wellness and financial protection." Among other things, the Flex Plan SPD explains how the Flex Plan works, who is eligible to participate, the participant's rights, and answers frequently asked questions about the Flex Plan. (Id., ¶ 14).

The Flex Plan details coverage options available for each benefit category under the plan, e.g., medical, dental, life, and long-term disability insurance. Based on the expected cost of the plan, the employee must pay the difference between the cost of the benefit premiums and the amount of flex credits. (Def.'s 56.1(a)(3) Statement ¶ 16). The Flex Plan SPD also details the specific benefits and coverages available under the Flex Plan. For example, the Flex Plan SPD provides that, for medical benefits, those plan participants using a preferred provider organization ("PPO") must pay a $15 co-pay per office visit and the Flex Plan will pay 90 percent of PPO hospital costs after the applicable deductible is met. Additionally, the Flex Plan SPD contains a detailed chart listing the employee's co-payments and coverage provided for each type of medical claim. (Id., ¶ 17).

Under the Flex Plan, as claim expenses are incurred, Cox or the employer arranges for cash to be deposited as employer contributions into a bank account maintained and controlled by Aetna, the Flex Plan's third-party administrator, pursuant to the parties' Administrative Services Agreement ("Services Agreement"). (Def.'s 56.1(a)(3) Statement ¶ 18). Under the Services Agreement, once employer contributions are deposited into the Aetna bank account, the funds are considered "Plan Benefits," which are defined as "payments under the Plan, excluding copayments, coinsurance, or deductibles required by the Plan." (Id., ¶ 19). Neither Cox nor the employer recaptures or diverts any funds for their own use from the funding arrangement with Aetna once those funds are deposited into the Aetna bank account. (Id., ¶ 20).

The Services Agreement provides that if the Services Agreement should be terminated, Cox's obligations continue until "all outstanding payments have been funded by the Customer or until such time mutually agreed upon by Aetna and Customer." (Def.'s 56.1(a)(3) Statement ¶ 21). The Services Agreement also imposes fiduciary responsibilities upon Aetna and ensures that employer

contributions to the Flex Plan will be used only for proper plan purposes. The Services Agreement provides:

> Aetna will discharge its obligations under the Services Agreement with that level of reasonable care which a similarly situated administrator of claims would exercise under similar circumstances. In connection with its fiduciary powers and duties hereunder, Aetna shall observe the standard of care and diligence required of a fiduciary under ERISA Section 404(a)(1)(B).

(Id., ¶ 22).

Under the Flex Plan, eligible employees may select from a "menu" of available benefit options, including medical, dental, life insurance, long-term disability benefits, and medical and dependent-care flexible spending accounts. (Def.'s 56.1(a)(3) Statement ¶ 23). The amount of flex credits available under the Flex Plan vary, depending on the benefits and coverage levels selected, but will generally be less than the total cost of the benefits. Therefore, in the majority of cases, the participant is required to contribute some amount toward the cost of the benefits he or she selects. (Id., ¶ 24). For example, in 2004, Abarca selected "Employee Only" medical and dental coverage, life insurance in the amount of her annual pay, child life insurance in the amount of $10,000, and long-term disability insurance in the amount of 60 percent of her annual pay. (Id., ¶ 25). The total costs of these benefits was $135.18 per pay period. (Id., ¶ 26). For payroll administrative purposes, this amount was stated as a monetary line item identified as "Group med Flex" in the "Deductions" section of Abarca's paycheck. (Id., ¶27). Greater Chicago allocated $112.83 in flex credits to Abarca to apply toward the cost of these benefits. (Id., ¶ 28). This amount was stated as "Flex Credits" in the "Earnings" section of Abarca's paycheck. (Id., ¶ 29). The net effect was that Abarca

was responsible for paying $22.35 per pay period – the difference between the cost of the benefits she selected and the flex credits provided by her employer. (Id., ¶ 30).

Eligible employees could also elect to waive one or more of the available benefits under the Flex Plan and would receive a cash benefit in lieu of such coverage. (Def.'s 56.1(a)(3) Statement ¶ 31). The cash benefit could either be applied toward the purchase of alternative benefits or be paid to the employee. (Id., ¶ 32). To waive medical or long-term disability coverage, the Flex Plan required the employee to provide satisfactory proof that the employee had other medical or long-term disability coverage, such as coverage under a spouse's plan. (Id., ¶ 33).

If an employee waived medical or dental coverage, the cash benefit that he or she would receive was significantly less than the flex credits that the employer would otherwise have provided for that coverage. (Def.'s 56.1(a)(3) Statement ¶ 34). For example, in 2005, Abarca waived medical coverage and received a cash benefit of $9.23 per pay period, as compared to the $104.77 in flex credits that would have been provided per pay period if Abarca had elected "employee only" medical coverage. (Id., ¶ 35). Likewise, in 2005, Abarca waived dental coverage and received a cash benefit of $2.38 per pay period, as compared to the $14.62 in flex credits that would have been provided per pay period if Abarca had elected dental coverage. (Id., ¶ 36).

In a very small percentage of cases – most commonly, where an employee waived both medical and dental benefits – an employee's total flex credits would exceed the total cost of the benefits he or she selected for the year, resulting in an actual cash payment to the employee. (Def.'s 56.1(a)(3) Statement ¶ 37). During the relevant period, Sierra never received actual cash payments under the Flex Plan; and Abarca received actual cash payments under the Flex Plan only during 2002 and the final two months of her employment in 2005, as a result of having waived medical and dental

coverage. (Id., ¶ 38). During the relevant period, the aggregate amount of the cash benefits provided under the Flex Plan represented a very small percentage of the total flex credits provided under the Flex Plan. The total cash benefits represented the following percentage of the total cost of flex credits provided under the Flex Plan: 0.81% for 2005; 0.96% for 2004; 1.02% for 2003; and 1.10% for 2002. (Id., ¶ 39).

Cox paid the benefit contributions to Aetna for the funding of the Flex Plan from a general operating bank account. (Plaint.'s 56.1(b)(3) Statement ¶¶ 1-2). During 2002, Cox paid a total of $154,515,245 to Aetna in benefit contributions to the Flex Plan. For the same time period, the flex credits provided by Cox's affiliates totaled $255,542,605. (Id., ¶ 3). However, this figure represents only the amounts paid to Aetna for providing health coverage under the PPO option and dental and disability coverage. The figure does not include flex credits for other Flex Plan aspects, such as those employees that participated in a Health Maintenance Organization ("HMO"). (Def.'s Response Plaint.'s 56.1(b)(3) Statement ¶ 3).

During 2003, Cox paid a total of $196,212,885 to Aetna in benefit contributions to the Flex Plan. For the same time period, the flex credits provided by Cox's affiliates totaled $257,911,755. (Plaint.'s 56.1(b)(3) Statement ¶ 4). However, this figure represents only the amounts paid to Aetna for providing health coverage under the PPO option and dental and disability coverage. The figure does not include flex credits for other Flex Plan aspects, such as those employees that participated in a HMO. (Def.'s Response Plaint.'s 56.1(b)(3) Statement ¶ 4).

During 2004, Cox paid a total of $240,024,704 to Aetna in benefit contributions to the Flex Plan. For the same time period, the flex credits provided by Cox's affiliates totaled $260,028,641. (Plaint.'s 56.1(b)(3) Statement ¶ 5). However, this figure represents only the amounts paid to Aetna

for providing health coverage under the PPO option and dental and disability coverage. The figure does not include flex credits for other Flex Plan aspects, such as those employees that participated in a HMO. (Def.'s Response Plaint.'s 56.1(b)(3) Statement ¶ 5).

During 2005, Cox paid a total of $282,952,780 to Aetna in benefit contributions to the Flex Plan. For the same time period, the flex credits provided by Cox's affiliates totaled $297,287,936. (Plaint.'s 56.1(b)(3) Statement ¶ 6). However, this figure represents only the amounts paid to Aetna for providing health coverage under the PPO option and dental and disability coverage. The figure does not include flex credits for other Flex Plan aspects, such as those employees that participated in a HMO. (Def.'s Response Plaint.'s 56.1(b)(3) Statement ¶ 6).

During 2002, Cox paid no benefit contributions to Aetna for Flex Plan benefits use by Abarca. The flex credits provided by Greater Chicago to Abarca for 2002 totaled $448.50, of which Abarca received $284.96 in cash. (Plaint.'s 56.1(b)(3) Statement ¶ 7). During 2003, Cox paid $1,795.18 in benefit contributions to Aetna for Flex Plan benefits use by Abarca. The flex credits provided by Greater Chicago to Abarca for that year totaled $2,937.74. (Id., ¶ 8; Def.'s Response Plaint.'s 56.1(b)(3) Statement ¶ 8). During 2004, Cox paid no benefit contributions to Aetna for Flex Plan benefits use by Abarca. The flex credits provided by Greater Chicago to Abarca for that year totaled $2,933.58. (Plaint.'s 56.1(B)(3) Statement ¶ 9). During Abarca's 2005 employment (up to March 2, 2005), Cox paid no benefit contributions to Aetna for Flex Plan benefits use by Abarca.

The flex credits provided by Greater Chicago to Abarca for that time period totaled $87.21, of which Abarca received $46.31 in cash.[1]

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001).

Greater Chicago seeks summary judgment on Plaintiffs' Fair Labor Standards Act and Illinois Minimum Wage Law claims as to those claims based on Greater Chicago's alleged failure to include flex credits in Plaintiffs' regular rate of pay for overtime purposes.[2] Greater Chicago contends that the flex credits were properly excluded from Plaintiffs' regular rate of pay as a matter of law.

---

[1] Greater Chicago calculated the flex credits provided to Abarca for the same time period as $116.28, of which Abarca received $61.74 in cash. Greater Chicago failed to cite any document supporting its calculation. However, the difference in calculations does not affect the Court's analysis. Accordingly, the Court will use Plaintiffs' calculations.

[2] The analysis applicable to Plaintiffs' IMWL claim is the same as the analysis applicable to Plaintiffs' FLSA claim. *See Condo v. Sysco Corp.*, 1 F.3d 599, 601 n.3 (7th Cir. 1993).

The FLSA provides that an employee who works more than forty hours in a given workweek must be compensated for the excess hours "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The statute defines the "regular rate" to "include all remuneration for employment paid to, or on behalf of, the employee" subject to certain exclusions. 29 U.S.C. § 207(e). One of the exclusions, referred to as the Benefit-Plan Contributions Exception, is "contributions irrevocably made by an employer to a trustee or third person pursuant to a bona fide plan providing old-age, retirement, life, accident, or health insurance or similar benefits for employees." 29 U.S.C. § 207(e)(4); *see also* 56 Ill. Admin. Code, ch. I, § 210.410(d) (IMWL containing the identical exception).

The Department of Labor regulations implementing Section 207(e)(4) specify five conditions that must be met for a benefit plan to qualify as a "bona fide plan," permitting an employer to exclude contributions made to the plan from an employee's regular rate of pay. The requirements are:

> (1) The contributions must be made pursuant to a specific plan or program adopted by the employer, or by contract as a result of collective bargaining, and communicated to the employees. This may be either a company-financed plan or an employer-employee contributory plan.
>
> (2) The primary purpose of the plan must be to provide systematically for the payment of benefits to employees on account of death, disability, advanced age, retirement, illness, medical expenses, hospitalization, and the like.
>
> (3) In a plan or trust, either:
>
> (i) The benefits must be specified or definitely determinable on an actuarial basis; or
> (ii) There must be both a definite formula for determining the amount to be contributed by the employer and a definite formula for

> determining the benefits for each of the employees participating in the plan; or
>
> (iii) There must be both a formula for determining the amount to be contributed by the employer and a provision for determining the individual benefits by a method which is consistent with the purposes of the plan or trust under section 7(e)(4) of the Act.
>
> * * *
>
> (4) The employer's contributions must be paid irrevocably to a trustee or third person pursuant to an insurance agreement, trust or other funded arrangement. The trustee must assume the usual fiduciary responsibilities imposed upon trustees by applicable law. The trust or fund must be set up in such a way that in no event will the employer be able to recapture any of the contributions paid in nor in any way divert the funds to his own use or benefit. . . .
>
> (5) The plan must not give an employee the right to assign his benefits under the plan nor the option to receive any part of the employer's contributions in cash instead of the benefits under the plan: *Provided, however*, that if a plan otherwise qualified as a bona fide benefit plan under section 7(e)(4) of the Act, it will still be regarded as a bona fide plan even though it provides, as an incidental part thereof, for the payment to an employee in cash of all or a part of the amount standing to his credit (i) at the time of the severance of the employment relation due to causes other than retirement, disability, or death, or (ii) upon proper termination of the plan, or (iii) during the course of employment under circumstances specified in the plan and not inconsistent with the general purposes of the plan to provide the benefits described in section 7(e)(4) of the Act.

29 C.F.R. § 778.215(a).

Plaintiffs do not contest that Greater Chicago has established that it has satisfied all five parts of 29 C.F.R. § 778.215(a), and the undisputed facts demonstrate that Greater Chicago has met all five parts of 29 C.F.R. § 778.215(a). Instead, Plaintiffs argue that Greater Chicago does not meet the statutory requirements for the Benefit Plan Contribution Exception because (1) the dollar amount of the employer contributions to the Flex Plan does not equal the "dollar amount" of the flex credits provided to employees and (2) Greater Chicago, Plaintiffs' employer, does not make the actual

10

contributions because Cox, its parent corporation, the Flex Plan sponsor, transfers Flex Plan contributions to Aetna.

As to Plaintiffs' first argument, Plaintiffs contend that Cox/Greater Chicago cannot establish that the Benefit-Plan Contributions Exception applies because the total employer contribution of flex credit payments made to employees did not equal the amount actually paid to Aetna. For example, in 2002, the total flex credits to employees by Cox was $255,542,605; but the total amount paid by Cox to Aetna was $154,515,245, a difference of $101,027,360. Therefore, Plaintiffs contend that the employees earned flex credits in the amount of $101,027,360 that were never paid to Aetna and should have been included as remuneration toward the employees' regular rate calculation because these funds were not "irrevocably made by [Cox/Greater Chicago] to [Aetna] pursuant to a bona fide plan."

Plaintiffs provide no authority in support of their argument and interpretation of flex credits; existing authority is to the contrary. The Bureau of National Affairs Cafeteria Plan Guide, at 1, expressly contemplates a flexible benefits plan, as in the instant case, where employers set prices and/or allocate funds to employees "in terms of 'real dollars' that reflect actual costs, or in dollars that do not represent real costs – sometimes referred to as 'flex dollars' – or credits." Here, Greater Chicago offers its employees a flex plan which allocates a certain number of "flex credits," calculated annually by relevant actuarial factors. These "flex credits" are just that – credits – there is no actual compensation or funds paid to Aetna at the time they are earned. The funds are paid to Aetna when the costs covered by the Plan are required to be paid by Aetna to the provider. For example, if an employee earned 100 flex credits every month, the employee would earn a total of 1,200 flex credits for the year. If the employee had covered charges of $1,000 for the year,

11

Greater Chicago would have to provide Aetna with $1,000 for the charges covered by the Plan. Greater Chicago would not be required to contribute an additional $200 to Aetna because Aetna was not required to pay out those funds. There is no additional $200 benefit to the employee because the 1,200 credits that the employee obtained were less than the actual $1,000 of the employee's covered charges.

Adopting Plaintiffs' interpretation would also prove to be impractical and unworkable because calculating overtime pay using Plaintiffs' interpretation would make timely payments of overtime effectively impossible. An employee's regular rate is typically based on the employee's remuneration in a given "workweek." 29 U.S.C. § 209; 29 C.F.R. § 778108. According to Plaintiffs, the employer would be required to determine whether the total allocated flex credits exceeded the total plan expenses for each applicable pay period and then calculate that portion of any excess amount attributable to each participating employer and each of their employees to determine all remuneration paid to an employee as the basis of establishing regular and overtime pay rates. Alternatively, an employer would have to determine on an individual-employee basis, for every employee and for every applicable pay period, the amount by which an employee's allocated flex credits exceed the claim expenses paid by the employer contributions for that employee. The lag time between a claim and the actual payment of the claim would make it impossible to determine the amount, if any remuneration, to include as that employee's pay for that pay period.

Based on the above, the "excess" flex credits as provided in the instant plan do not constitute remuneration and need not be considered when calculating the regular rate of pay for purposes of overtime.

12

Secondly, Plaintiffs argue that the Benefit-Plan Contributions Exception does not apply because Cox, not Greater Chicago, made the actual payments to Aetna; and Cox is not Plaintiffs' employer, as required by 29 U.S.C. § 207(e)(4). Plaintiffs' argument mischaracterizes the relationship and role of Greater Chicago and Cox. Cox is Greater Chicago's parent company and the plan sponsor. While Cox is responsible for depositing the employer contributions with Aetna on behalf of its employer-subsidiaries, such as Greater Chicago, Greater Chicago bears the contribution obligation under the Flex Plan for its employees. The undisputed facts demonstrate that Greater Chicago, Plaintiffs' employer, contributed the costs of Plaintiffs' benefits under the Flex Plan.

Based on the above, Greater Chicago has demonstrated that the Flex Plan is a bona fide plan under the FLSA and that the flex credits were properly excluded from Plaintiffs' regular rate of pay. Accordingly, partial summary judgment is granted to Greater Chicago as to Plaintiffs' FLSA and IMWL claims based on Greater Chicago's not including Plaintiffs' flex credits in Plaintiffs' regular rate of pay for overtime purposes.

## CONCLUSION

For the foregoing reasons, Greater Chicago's Motion for Partial Summary Judgment on the "Flex Credit" Issue is granted.

Dated: January 19, 2007

JOHN W. DARRAH
United States District Court Judge

13